# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HAROLD A. BERGER, Individually and<br>On Behalf of All Others Similarly Situated,    )<br>                                          )<br>                    Plaintiff,             )<br>                                          )<br>        vs.                               )<br>                                          )<br>MASSACHUSETTS FINANCIAL SERVICES          )<br>COMPANY, MFS INVESTMENT                    )<br>MANAGEMENT, SUN LIFE FINANCIAL, INC.      )<br>MFS SERIES TRUST I, MFS SERIES TRUST II,  )<br>MFS SERIES TRUST III, MFS SERIES TRUST    )<br>IV, MFS SERIES TRUST V, MFS SERIES        )<br>TRUST VI, MFS SERIES TRUST VII,           )<br>MFS SERIES TRUST VIII, MFS SERIES TRUST   )<br>IX, MFS SERIES TRUST X, MFS SERIES        )<br>TRUST XI, MFS CAPITAL OPPORTUNITIES       )<br>FUND, MFS CORE GROWTH FUND; MFS           )<br>EMERGING GROWTH FUND, MFS LARGE           )<br>CAP GROWTH FUND, MFS MANAGED              )<br>SECTORS FUND, MFS MID CAP GROWTH          )<br>FUND, MFS NEW DISCOVERY FUND, MFS         )<br>NEW ENDEAVOR FUND, MFS RESEARCH           )<br>FUND, MFS STRATEGIC GROWTH FUND,          )<br>MFS TECHNOLOGY FUND,                       )<br>MASSACHUSETTS INVESTORS GROWTH            )<br>STOCK, MFS MID CAP VALUE FUND, MFS        )<br>RESEARCH GROWTH AND INCOME FUND,          )<br>MFS TOTAL RETURN FUND, MFS UNION          )<br>STANDARD EQUITY FUND, MFS UTILITIES       )<br>FUND, MFS VALUE FUND, MASSACHUSETTS       )<br>INVESTORS TRUST, MFS AGGRESSIVE           )<br>GROWTH ALLOCATION FUND, MFS               )<br>CONSERVATIVE ALLOCATION FUND,             )<br>MFS MODERATE ALLOCATION FUND,             )<br>MFS BOND FUND, MFS EMERGING MARKETS)<br>DEBT FUND, MFS GOVERNMENT LIMITED         )<br>MATURITY FUND, MFS GOVERNMENT             )<br>MORTGAGE FUND, MFS GOVERNMENT             )<br>SECURITIES FUND,                          )  | **CIVIL ACTION NO.**<br><br>**04   10253 WGY**<br><br>**CLASS ACTION COMPLAINT**<br><br>**<u>JURY TRIAL DEMANDED</u>**<br><br>MAGISTRATE JUDGE Alexander<br><br>RECEIPT #_____ 53596<br>AMOUNT $ 150 — VISA<br>SUMMONS ISSUED Yes<br>LOCAL RULE 4.1_____<br>WAIVER FORM_____<br>MCF ISSUED_____<br>BY DPTY. CLK. ___ fam<br>DATE 2/5/04 |

**[Caption continued on next page]**

MFS HIGH INCOME FUND, MFS HIGH YIELD )
OPPORTUNITIES FUND, MFS INTERMEDIATE )
INVESTMENT GRADE BOND FUND, MFS      )
LIMITED MATURITY FUND, MFS RESEARCH )
BOND FUND, MFS STRATEGIC INCOME      )
FUND, MFS ALABAMA MUNICIPAL BOND     )
FUND, MFS ARKANSAS MUNICIPAL BOND    )
FUND, MFS CALIFORNIA MUNICIPAL BOND  )
FUND, MFS FLORIDA MUNICIPAL BOND     )
FUND, MFS GEORGIA MUNICIPAL BOND     )
FUND, MFS MARYLAND MUNICIPAL BOND    )
FUND, MFS MASSACHUSETTS MUNICIPAL    )
BOND FUND, MFS MISSISSIPPI MUNICIPAL )
BOND FUND, MFS MUNICIPAL BOND FUND,  )
MFS MUNICIPAL LIMITED MATURITY FUND, )
MFS NEW YORK MUNICIPAL. BOND FUND,   )
MFS NORTH CAROLINA MUNICIPAL BOND    )
FUND, MFS PENNSYLVANIA MUNICIPAL     )
BOND FUND, MFS SOUTH CAROLINA        )
MUNICIPAL BOND FUND, MFS TENNESSEE   )
MUNICIPAL BOND FUND, MFS VIRGINIA    )
MUNICIPAL BOND FUND, MFS WEST        )
VIRGINIA MUNICIPAL BOND FUND, MFS    )
EMERGING MARKETS EQUITY FUND,        )
MFS GLOBAL EQUITY FUND, MFS GLOBAL,  )
GROWTH FUND, MFS GLOBAL TOTAL        )
RETURN FUND, MFS INTERNATIONAL       )
GROWTH FUND, MFS INTERNATIONAL       )
NEW DISCOVERY FUND, MFS              )
INTERNATIONAL VALUE FUND,            )
MFS RESEARCH INTERNATIONAL FUND,     )
and DOES 1 -100,                     )
                                     )
              Defendants.            )
_____)

Plaintiff Harold A. Berger individually and on behalf of all other persons similarly

situated, by his undersigned attorneys, for his complaint against defendants, alleges the following

based upon personal knowledge as to himself and his own acts, and information and belief as to

all other matters, based upon, inter alia, the investigation conducted by and through his attorneys,

2

which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding the MFS Family of Mutual Funds and advisories about the funds, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.    This is a class action on behalf of a class (the "Class") of all purchasers, redeemers and holders of MFS Family of Funds (as defined below), who purchased, held, or otherwise acquired shares between December 15, 1998 and December 8, 2003 (the "Class Period"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act"), the Securities Exchange Act of 1934 (the "Exchange Act"), the Investment Company Act of 1940 (the "Investment Company Act"), and for common law breach of fiduciary duties.

## JURISDICTION AND VENUE

2.    The claims asserted herein arise under and pursuant to Sections 10(b), and 20(a) of the Exchange Act, [15 U.S.C. §§ 78j(b) and 78t(a)], and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5]. Additionally, this action arises under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. §§ 77k, 771(a)(2), and 77(o)] and pursuant to §§ 34 and 36 of the Investment Company Act [15 U.S.C. §§ 80a-33 and 35].

3.    This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act of 1934 [15 U.S.C. § 78aa]; Section 22 of the Securities Act [15 U.S.C. § 77v]; and §§ 34 and 36 of the Investment Company Act [15 U.S.C. § 80a-35].

3

4.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.    Plaintiff Harold A. Berger bought and held shares of certain Massachusetts Financial Services Mutual Funds during the Class Period, as detailed in the attached certification, and has suffered damages as a result of the wrongful acts of defendants as alleged herein.

7.    Defendant Massachusetts Financial Services Company is a registered investment adviser located in Boston, Massachusetts. Massachusetts Financial Services Company manages the MFS Family of Mutual Funds. Massachusetts Financial Services Company maintains its principal place of business at 500 Boylston Street, Boston, MA 02116.

8.    Defendant MFS Investment Management is registered investment adviser located in Boston Massachusetts. MFS Investment Management manages the MFS Family of Mutual Funds. MFS Investment Management maintains its principal place of business at 500 Boylston Street, Boston, MA 02116.

9.    Defendants Massachusetts Financial Services Company and MFS Investment Management are collectively referred to as "MFS."

4

10.     Defendants MFS Series Trust I, II, III, IV, V, VI, VII, VIII, IX, X, and XI (collectively referred to as the "Fund Registrants") are the registrants of the MFS Family of Mutual Funds. The Fund Registrants maintain a principal place of business at 500 Boylston Street, Boston, MA 02116.

11.     Defendant Sun Life Financial, Inc. ("Sun Life") is an internationally diversified financial services organization providing savings, retirement and pension products, as well as life and health insurance to individuals and groups through its operations in Canada, the United States, the United Kingdom and Asia. Sun Life is the parent company of MFS.

12.     Defendants MFS Capital Opportunities Fund, MFS Core Growth Fund, MFS Emerging Growth Fund, MFS Large Cap Growth Fund, MFS Managed Sectors Fund, MFS Mid Cap Growth Fund, MFS New Discovery Fund, MFS New Endeavor Fund, MFS Research Fund, MFS Strategic Growth Fund, MFS Technology Fund, Massachusetts Investors Growth Stock, MFS Mid Cap Value Fund, MFS Research Growth and Income Fund, MFS Total Return Fund, MFS Union Standard Equity Fund, MFS Utilities Fund, MFS Value Fund, Massachusetts Investors Trust, MFS Aggressive Growth Allocation Fund, MFS Conservative Allocation Fund, MFS Moderate Allocation Fund, MFS Bond Fund, MFS Emerging Markets Debt Fund, MFS Government Limited Maturity Fund, MFS Government Mortgage Fund, MFS Government Securities Fund, MFS High Income Fund, MFS High Yield Opportunities Fund, MFS Intermediate Investment Grade Bond Fund, MFS Limited Maturity Fund, MFS Research Bond Fund, MFS Strategic Income Fund, MFS Alabama Municipal Bond Fund, MFS Arkansas Municipal Bond Fund, MFS California Municipal Bond Fund, MFS Florida Municipal Bond Fund, MFS Georgia Municipal Bond Fund, MFS Maryland Municipal Bond Fund, MFS

5

Massachusetts Municipal Bond Fund, MFS Mississippi Municipal Bond Fund, MFS Municipal Bond Fund, MFS Municipal Limited Maturity Fund, MFS New York Municipal Bond Fund, MFS North Carolina Municipal Bond Fund, MFS Pennsylvania Municipal Bond Fund, MFS South Carolina Municipal Bond Fund, MFS Tennessee Municipal Bond Fund, MFS Virginia Municipal Bond Fund, MFS West Virginia Municipal Bond Fund, MFS Emerging Markets Equity Fund, MFS Global Equity Fund, MFS Global Growth Fund, MFS Global Total Return Fund, MFS International Growth Fund, MFS International New Discovery Fund, MFS International Value Fund, and MFS Research International Fund (collectively referred to as the "MFS Funds") are mutual funds that are registered under the Investment Company Act and managed by MFS with its principal place of business located at 500 Boylston Street, Boston, MA 02116.

13.     The true names and capacities (whether individual, corporate, associate, or otherwise) of defendants Does 1 through 100, inclusive, and each of them, are unknown to Plaintiff, who sues said defendants by such fictitious names. Plaintiff is informed and believes, and therefore alleges, that each of the defendants fictitiously named herein is legally responsible in some actionable manner for the events described herein, and thereby proximately caused the damage to the Plaintiff and the members of the Class.

## CLASS ACTION ALLEGATIONS

14.     Plaintiff brings this action as a federal class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all purchasers, redeemers and holders of the mutual fund shares that are the subject of this lawsuit, who purchased, held, or otherwise acquired shares between December 15,1998 and December 8,

2003, inclusive, (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

15.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.

16.    Plaintiff's claims are typical of the claims of the members of the Class, because plaintiff and all of the Class members sustained damages arising out of defendants' wrongful conduct complained of herein.

17.    Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel who are experienced and competent in class actions and securities litigation.

18.    A Class Action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

19.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the

7

Class are:

    (a)    Whether the federal securities laws were, violated by defendants' acts as alleged herein;

    (b)    Whether defendants breached their fiduciary duties by engaging in fraudulent activity; and

    (c)    Whether the members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

20.    This action concerns a fraudulent scheme and course of action which was intended to and indeed did benefit mutual funds and their advisors at the expense of mutual fund investors. In connection therewith, defendants violated their fiduciary duties to their customers in return for substantial fees and other income for themselves and their affiliates.

21.    The defendants' wrongful conduct involved "timing" of mutual funds. "Timing" is an investment technique involving short-term, "in and out" trading of mutual fund shares. The technique is designed to exploit inefficiencies in the way mutual fund companies price their shares. It is widely acknowledged that timing inures to the detriment of long-term shareholders. Because of this detrimental effect, mutual fund prospectuses typically state that timing is monitored and the funds work to prevent it. Nonetheless, in return for investments that will increase fund managers' fees, fund managers enter into undisclosed agreements to allow timing.

22.    In fact, certain mutual fund companies have employees (generally referred to as the"timing police") who are supposed to detect "timers" and put a stop to their short-term trading

8

activity. Nonetheless, defendants arranged to give market timers a "pass" with the timing police, who would look the other way rather than attempt to shut down their short-term trading.

23.    The mutual fund prospectuses for the funds at issue created the misleading impression that mutual funds were vigilantly protecting investors against the negative effects of timing. In fact,the opposite was true: defendants sold the right to time their funds to other hedge fund investors. The prospectuses were silent about these arrangements.

24.    As a result of the "timing" of mutual funds, the Doe Defendants, other timers, and defendants and their intermediaries profited handsomely. The losers were unsuspecting long-term mutual fund investors. Defendants' profits came dollar-for-dollar out of their pockets.

## TIMING

25.    Mutual funds are designed for buy-and-hold investors, and are therefore the favored homes for Americans' retirement and college savings accounts. Nevertheless, quick-turnaround traders routinely try to trade in and out of certain mutual funds in order to exploit inefficiencies in the way they set their Net Asset Values or "NAVs."

26.    This strategy works only because some funds use "stale" prices to calculate the value of securities held in the fund's portfolio. These prices are "stale" because they do not necessarily reflect the "fair value" of such securities as of the time the NAV is calculated. A typical example is a U.S. mutual fund that holds Japanese shares. Because of the time zone difference, the Japanese market may close at 2:00 a.m. New York time. If the U.S. mutual fund manager uses the closing prices of the Japanese shares in his or her fund to arrive at a NAV at 4:00 p.m. in New York, he or she is relying on market information that is fourteen hours old. If there have been positive market moves during the New York trading day that will cause the

Japanese market to rise when it later opens, the stale Japanese prices will not reflect them, and the fund's NAV will be artificially low. Put another way, the NAV does not reflect the true current market value of the stocks the fund holds. On such a day, a trader who buys the Japanese fund at the "stale" price is virtually assured of a profit that can be realized the next day by selling. Taking advantage of this kind of short-term arbitrage repeatedly in a single mutual fund is called "timing" the fund.

27.    Effective timing captures an arbitrage profit. The arbitrage profit from timing comes dollar-for-dollar out of the pockets of the long-term investors: the timer steps in at the last moment and takes part of the buy-and-hold investors' upside when the market goes up, so the next day's NAV is reduced for those who are still in the fund. If the timer sells short on bad days -- as the Doe Defendants did -- the arbitrage has the effect of making the next day's NAV lower than it would otherwise have been, thus magnifying the losses that investors are experiencing in a declining market.

28.    Besides the wealth transfer of arbitrage (called "dilution"), timers also harm their target funds in a number of other ways. They impose their transaction costs on the long-term investors. Indeed, trades necessitated by timer redemptions can also lead to realization of taxable capital gains at an undesirable time, or may result in managers having to sell stock into a falling market. Accordingly, fund managers often seek to minimize the disruptive impact of timers by keeping cash on hand to pay out the timers' profits without having to sell stock. This "strategy" does not eliminate the transfer of wealth out of the mutual fund caused by timing; it only reduces the administrative cost of those transfers. However, at the same time it can also reduce the overall performance of the fund by requiring the fund manager to keep a certain amount of the

10

funds' assets in cash at all times, thus depriving the investors of the advantages of being fully invested in a rising market. Some fund managers even enter into special investments as an attempt to "hedge" against timing activity (instead of just refusing to allow it), thus deviating altogether from the ostensible investment strategy of their funds, and incurring further transaction costs.

29.     Mutual fund managers are aware of the damaging effect that timers have on their funds. While it is virtually impossible for fund managers to identify every timing trade, large movements in and out of funds -- like those made by the Doe Defendants-- are easy for managers to spot, and mutual fund managers have tools to fight back against timers.

30.     Fund managers typically have the power simply to reject timers' purchases. As fiduciaries for their investors, mutual fund managers are obliged to do their best to use these weapons to protect their customers from the dilution that timing causes.

31.     The incentive to the defendant mutual funds to engage in such wrongdoing is as follows: Typically a single management company sets up a number of mutual funds to form a family. While each mutual fund is in fact its own company, as a practical matter, the management company runs it. The portfolio managers who make the investment decisions for the funds and the executives to whom they report are all typically employees of the management company, not the mutual funds themselves. Still, the management company owes fiduciary duties to each fund and each investor.

32.     The management company makes its profit from fees it charges the funds for financial advice and other services. These fees are typically a percentage of the assets in the fund, so the more assets in the family of funds, the more money the manager makes. The timer

understands this perfectly, and frequently offers the manager more assets in exchange for the right to time. Fund managers have succumbed to temptation and allowed investors in the target funds to be hurt in exchange for additional money in their own pockets in the form of higher management fees.

33.     Thus, by keeping money -- often many millions of dollars -- in the same family of mutual funds (while moving the money from fund to fund), The Doe Defendants assured the manager that he or she would collect management and other fees on the amount whether it was in the target fund, the resting fund, or moving in between. In addition, sometimes the manager would waive any applicable early redemption fees. By doing so, the manager would directly deprive the fund of money that would have partially reimbursed the fund for the impact of timing.

34.     As an additional inducement for allowing the timing, fund managers often received "sticky assets." These were typically long-term investments made not in the mutual fund in which the timing activity was permitted, but in one of the fund manager's financial vehicles (e.g., a bond fund or a hedge fund run by the manager) that assured a steady flow of fees to the manager.

35.     These arrangements were never disclosed to mutual fund investors. On the contrary, many of the relevant mutual fund prospectuses contained materially misleading statements assuring investors that the fund managers discouraged and worked to prevent mutual fund timing.

## THE SCHEME WITHIN THE MFS FUNDS

36.     On September 3, 2003, the New York State Attorney General Elliot Spitzer (the

"Attorney General") attacked the mutual fund industry by filing a complaint charging fraud

against, *inter alia*, Canary Capital Partners, LLP ("Canary") in connection with the unlawful

mutual fund practices of late trading and timing. More specifically, the Attorney General alleged

the following: "Canary developed a complex strategy that allowed it to in effect sell mutual funds

short and profit on declining NAVs." Additionally, the Attorney General alleged that Canary set

up arrangements with Bank of America, Bank One, Janus, and Strong to late trade and time those

companies' respective mutual funds. The Attorney General further alleged:

> Bank of America ... (i) set Canary up with a state-of-the art
> electronic late trading platform, allowing it to trade late in the
> hundreds of mutual funds that the bank offers to its customers, (ii)
> gave Canary permission to time the Nations Funds Family (iii)
> provided Canary with approximately $300 million of credit to
> finance this late trading and timing, and (iv) sold Canary the
> derivative short positions it needed to time the funds as the market
> dropped. None of these facts were disclosed in the Nations Funds
> prospectuses. In the process, Canary became one of Bank of
> America's largest customers. The relationship was mutually
> beneficial in that Canary made tens of millions through late trading
> and timing, while the various parts of the Bank of America that
> serviced Canary made millions themselves.

37.    In connection with an examination of active trading of mutual fund shares by the

United States Securities and Exchange Commission ("SEC") and the Attorney General, MFS and

Sun Life received inquiries and subpoenas for documents from those agencies.

38.    On December 8, 2003, Sun Life and MFS announced that the staff of the Boston

office of the SEC had indicated that it intended to recommend to the SEC that an enforcement

action be taken against MFS alleging, in effect, that the disclosure in certain of MFS' fund

prospectuses concerning market timing was false and misleading, and breach of fiduciary duty.

39.    On December 9, 2003, *The New York Times* (the *"Times"*) reported that MFS

"allowed privileged clients to trade quickly in and out of its biggest funds while saying it restricted the practice for the vast majority of its shareholders, according to a memorandum from a senior company executive." The *Times* further reported that the memorandum showed that in 2001, executives at MFS essentially created two classes of funds - a small group of large funds that would accept rapid-fire trades, a practice known as market timing, and a larger group of international funds that would not.  At no time, though, did MFS change the language in its prospectuses, which said that market timing was not permitted in any of its funds.  Additionally, the *Times* reported that "[a]mong the most popular offerings was MFS Emerging Growth, one of the five equity funds that MFS made available to market timers.  But no restrictions were placed on Massachusetts Investors Trust, Massachusetts Investors Growth Stock Fund, MFS Research Fund, MFS Total Return Fund or the emerging growth fund.  The rationale was that because these funds were very large and liquid, excessive trading would not harm shareholders."

40.     The actions of the defendants have harmed plaintiff and members of the Class.   In essence, the defendants' actions of allowing market timing to occur have caused plaintiff and members of the Class' shares to be diluted in value.

41.     As such, defendants have breached their fiduciary duties to plaintiff and the Class by lying to investors about their effort to curb market timers by entering into undisclosed agreements intended to boost their fees and permitting The Doe Defendants and others to time the mutual funds.  As a result, defendants have violated the Securities Act, the Exchange Act, the Investment Company Act, and common law fiduciary duties.

## THE MFS MUTUAL FUND'S PROSPECTUSES WERE MATERIALLY FALSE AND MISLEADING

42.     The MFS Mutual Funds' Prospectuses stated that its **"MFS Funds do not permit market timing or other excessive trading practices.  Excessive, short-term (market timing) trading practices may disrupt portfolio management strategies and harm fund performance.  MFS Funds will reject or restrict an investor's purchase orders if there is a history of market timing... Requests to exchange shares of MFS global and international funds that have not been held for 15 days will be refused... ."** (Emphasis added.)

43.     Given that MFS allowed market timing of its funds to occur, its prospectuses were false and misleading because it failed to disclose the following: (a) that defendants had entered into unlawful agreements allowing the Doe Defendants to time their trading of the MFS Funds shares; (b) that, pursuant to those agreements, the Doe Defendants regularly timed the MFS Funds; (c) that, contrary to the representations in the Prospectuses, MFS only enforced their policy against frequent traders selectively; (d) that the defendants regularly allowed the Doe Defendants to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs, thereby reducing the MFS Funds' actual performance; and (e) the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the Doe Defendants benefited financially at the expense of MFS Funds' investors including plaintiff and other members of the Class.

## UNDISCLOSED ADVERSE INFORMATION

44.     The market for the MFS Funds was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to

disclose, the MFS Funds traded at distorted prices during the Class Period. Plaintiff and other

members of the Class purchased or otherwise acquired the MFS Funds relying upon the integrity

of the NAV for the MFS Funds and market information relating to the MFS Funds, and have

been damaged thereby.

45.    During the Class Period, defendants materially misled the investing public,

thereby distorting the NAV of the MFS Funds, by allowing the Doe Defendants to time the MFS

Funds.

46.    At all relevant times, the material misrepresentations and omissions

particularized in this Complaint directly or proximately caused or were a substantial contributing

cause of the damages sustained by plaintiff and other members of the Class.

## ADDITIONAL SCIENTER ALLEGATIONS

47.    As alleged herein, defendants acted with scienter in that defendants knew that the

public documents and statements issued or disseminated in the name of the MFS Funds were

materially false and misleading; knew that such statements or documents would be issued or

disseminated to the investing public; and knowingly and substantially participated or acquiesced

in the issuance or dissemination of such statements or documents as primary violations of the

federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their

receipt of information reflecting the true facts regarding the MFS Funds, their control over,

and/or receipt and/or modification of the MFS Funds' allegedly materially misleading

misstatements and/or their associations with the MFS Funds which made them privy to

confidential proprietary information concerning the MFS Funds, participated in the fraudulent

scheme alleged herein.

48.    Additionally, the defendants were highly motivated to allow and facilitate the wrongful conduct alleged herein and participated in and/or had actual knowledge of the fraudulent conduct alleged herein. In exchange for allowing the unlawful practices alleged herein, the defendants, among other things, received increased management fees from "sticky assets" as well as an increased number of transactions in and out of the funds, and were able to profit from this illegal activity. In short, defendants siphoned money out of the mutual funds and into their own pockets.

49.    The defendants were motivated to participate in the wrongful scheme by the enormous profits they derived therefrom. They systematically pursued the scheme with full knowledge of its consequences to other investors.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

50.    At all relevant times, the market for the MFS Funds was an efficient market for the following reasons, among others:

(a)    The MFS Funds met the requirements for listing, and were listed and actively traded on a highly efficient and automated market;

(b)    As regulated issuers, the MFS Funds filed periodic public reports with the SEC;

(c)    The MFS Funds regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as

17

communications with the financial press and other similar reporting services; and

(d)    The MFS Funds were followed by several mutual fund analysts who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

51.    As a result of the foregoing, the market for the MFS Funds promptly digested current information regarding the MFS Funds from all publicly available sources and reflected such information in the MFS Funds' NAV. Under these circumstances, all purchasers of the MFS Funds during the Class Period suffered similar injury through their purchases of the MFS Funds' shares at distorted prices, and, therefore, a presumption of reliance applies.

## NO SAFE HARBOR

52.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the defendants who knew that those statements were false

18

when made.

## COUNT ONE
## AGAINST THE FUND REGISTRANTS FOR VIOLATIONS
## OF SECTION 11 OF THE SECURITIES ACT

53.    Plaintiff repeats and realleges each and every allegation contained above as if fully set

fort herein, except that, for purposes of this claim, plaintiff expressly excludes and disclaims any

allegation that could be construed as alleging fraud or intentional or reckless misconduct and

otherwise incorporates the allegations contained above.

54.    This claim is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k,

on behalf of the plaintiff and other members of the Class against the Fund Registrants.

55.    The Fund Registrants are the registrants for the MFS Funds sold to plaintiff and the

other members of the Class and are statutorily liable under Section 11. The Fund Registrants issued,

caused to be issued and participated in the issuance of the materially false and misleading written

statements and/or omissions of material facts that were contained in the Prospectuses.

56.    Plaintiff was provided with the MFS Emerging Growth Fund Prospectus and,

similarly,  prior to purchasing units of each of the other MFS Funds, all Class members likewise,

received the appropriate prospectus, Plaintiff and other Class members purchased shares of the MFS

Funds traceable to the relevant false and misleading Prospectuses and were damaged thereby.

57.    As set forth herein, the statements contained in the Prospectuses, when they

became  effective, were materially false and misleading for a number of reasons, including that

they stated that  it was the practice of the MFS Funds to monitor and take steps to prevent timed

trading because of its adverse effect on fund investors, and that the trading price was determined

as of 4 p.m. each trading day with respect to all investors when, in fact, select investors (the Does

19

named as defendants herein) were allowed to engage in timed trading. The Prospectuses failed to disclose and misrepresented, *inter alia*, the following material and adverse facts: (a) that defendants had entered into unlawful agreements allowing the Doe Defendants to time their trading of the MFS Funds shares; (b) that, pursuant to those agreements, the Doe Defendants regularly timed the MFS Funds; (c) that, contrary to the representations in the Prospectuses, the MFS Funds only enforced their policy against frequent traders selectively, (d) that the defendants regularly allowed the Doe Defendants to engage in trades that were disruptive to the efficient management of the MFS Funds and/or increased the MFS Funds' costs, thereby reducing the MFS Funds' actual performance; and (e) the Prospectuses failed to disclose that, pursuant to the unlawful agreements, the Doe Defendants benefited financially at the expense of MFS Funds' investors including plaintiff and other members of the Class.

58.    At the time they purchased the MFS Funds' shares traceable to the defective Prospectuses, Plaintiff and Class members were without knowledge of the facts concerning the false and misleading statements or omissions alleged herein and could not reasonably have possessed such knowledge. This claim was brought within the applicable statute of limitations.

**COUNT TWO**
**AGAINST SUN LIFE AND MFS AS CONTROL PERSONS FOR VIOLATIONS**
**OF SECTION 15 OF THE SECURITIES ACT**

59.    Plaintiff repeats and realleges each and every allegation contained above, except that for purposes of this claim, plaintiff expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless misconduct and otherwise incorporates the allegations contained above.

60.    This Claim is brought pursuant to Section 15 of the Securities Act against Sun

20